**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| AGS CONTRACTING LLC, :<br>*United States for the use and benefit of,* :<br> :<br> Plaintiff, :<br> :<br> v. :<br> :<br>OUTSIDE THE BOX, LLC a/k/a :<br>OUTSIDE THE BOX VA, LLC, and :<br>HUDSON INSURANCE COMPANY :<br> :<br> Defendant. :<br> : | CASE NO:  7:20-cv-255 (WLS) |

## ORDER

Before the Court is Defendants Outside the Box, LLC and Hudson Insurance Company's Motion for Summary Judgment (Doc. 66) and Plaintiff AGS's ("Plaintiff") Motion for Summary Judgment (Doc. 69). For the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 66) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and Plaintiff's Motion for Summary Judgment (Doc. 69) is **GRANTED-IN-PART** and **DENIED-IN-PART.**

## I.    RELEVANT PROCEDURAL BACKGROUND

On June 26, 2020, Plaintiff filed this action in the Eastern District of North Carolina against Defendants alleging breach of contract, a quantum meruit claim, violations of the Miller Act, and violations of the North Carolina Prompt Payment Act. (Doc. 1, at ¶¶ 45-82). On October 10, 2020, Defendants filed a motion to transfer the case to the Middle District of Georgia (Doc. 10), which was granted on December 29, 2020 (Doc. 16). On February 16, 2021, Defendants filed their answer and counterclaim asserting a claim for anticipatory repudiation. (Doc. 23).

Defendants filed their motion for summary judgment on November 14, 2022. (Doc. 66). Therein, Defendants contend that they are entitled to summary judgment on Plaintiff's breach of contract, quantum meruit, Miller Act, and Prompt Payment Act claims; and

Defendants' counterclaim for Anticipatory Repudiation. (Doc. 66, at 14–27). On December 5, 2022, Plaintiff filed its own motion for Summary Judgment (Doc. 69) and a response (Doc. 72) to Defendants' Motion for Summary Judgment. Therein, Plaintiff contends that it is entitled to summary judgment on its breach of contract, and Miller Act claims, and Defendants' counterclaim for Anticipatory Repudiation. (Doc. 69, at 12–21). Because each motion contains inter-related arguments, the Court will consider them together. Defendants filed their response and reply to Plaintiff's briefs on January 6, 2023, and January 9, 2023, respectively. (Docs. 75 & 76). All parties have filed their respective responses, and the motions for summary judgment are fully briefed and ripe for ruling.

## II.   RELEVANT FACTUAL BACKGROUND

The following facts are derived from Plaintiff's Complaint (Doc. 1), Defendants' Answer to the Complaint and Counterclaim (Doc. 23), Defendants' Motion for Summary Judgment (Doc. 66), Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. 72) Plaintiff's Motion for Summary Judgment (Doc. 69), Defendants' Reply to Plaintiff's Motion for Summary Judgment (Doc. 75), and Defendants' Response to Plaintiff's Response. (Doc. 76); including all exhibits attached to the foregoing documents. Where relevant, the factual summary also includes undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to the nonmoving party. See FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.   The Project

The present action arose from a federal construction project, administered by the Fish and Wildlife Service ("FWS"), located in the Great Dismal Swamp National Wildlife Refuge in Suffolk, Virginia. (Doc. 66-1, at 48). Defendant Outside the Box ("Defendant OTB") held a prime contract with FWS to install culverts on an access road within the Wildlife Refuge ("the Project"). (*See* Doc. 66-1, at 47). Defendant OTB subcontracted with Plaintiff to complete most of the work under the prime contract. (Doc. 66, at 47–66). Defendant Hudson Insurance Company served as surety and executed a payment bond guaranteeing payment under the prime contract and subcontract. (*See* Doc. 69-3).

On October 15, 2018, Plaintiff and Defendant OTB entered into a subcontract agreement ("the Agreement") to complete work on the Project. (Doc. 69-2). Neither party disputes that the Agreement was a properly executed, valid, and enforceable contract. (Doc. 66, at 2 ¶ 1); (Doc. 72-2, at 1 ¶ 1). The Agreement provided that Plaintiff would repair an access road in the Great Dismal Swamp by installing four new culverts and re-graveling the road surface. (Doc. 66-1, at 47–55). In exchange for the repairs to the access road under the Agreement, Defendant OTB would pay Plaintiff $310,000. (Doc. 69-2, at 5 ¶ 1.0). Plaintiff agreed to begin work under the Agreement within ten days of receiving a notice to proceed from Defendant OTB and agreed to complete the work within 180 days. (*Id.*, at 2 ¶ 3.0). Because the Agreement was a subcontract to Defendant OTB's prime contract with FWS it contained several "flow down" provisions, which incorporated elements of Defendant OTB's prime contract into the subcontract with Plaintiff. (Doc. 66-1, at 1, ¶ 2.0); (*See* Doc. 66-1, at 18–20). On November 14, 2018, Defendant OTB issued a notice to proceed to Plaintiff, and Plaintiff mobilized and began its work on the Project. (*See* Doc. 69-4, at 1, ¶ 4-5); (*see also* Doc. 76, at 2–11).

Nearly two weeks later, on November 28, 2018, Defendant OTB's representative, notified Plaintiff that a government shutdown was possible; in the event of a shutdown, FWS appropriations for the Project would lapse, and if the shutdown occurred, Plaintiff should cease work on the Project. (*See* Doc. 69-5). The government did, indeed, shut down and on December 26, 2018, Defendant OTB directed Plaintiff, by email, to cease all work on the Project until Defendant OTB notified them to resume in writing. (Doc. 69-6, at 1).

On December 28, 2018, Plaintiff submitted an invoice, "Invoice 1012." billing $22, 273 for stone dust transported to the worksite, demolition of an existing culvert, delivery of four culverts, erosion control/seeding, and sanitation of all trucks entering the worksite. (Doc. 66-3, at 14–21). The invoice due date was January 15, 2019. (Doc. 66-3, at 13-14). Defendant OTB, however, did not dispute the December 28, 2018, request for payment until June 17, 2019. (Doc. 76-12, at 8).

On January 10, 2019, two days after the government shutdown ended, Plaintiff returned to the project to evaluate site conditions. (*See* Doc 69-7, at 1); (Doc. 66–2 at 1). When Plaintiff returned to the Project, heavy rains had caused conditions on the site to deteriorate

significantly. (*See* Doc. 66-3, at 10). While at the beginning of the Project, there was no significant water present onsite, when Plaintiff returned, water had risen and covered much of the access road. (*Id.*). The water also impeded the ability of Plaintiff's trucks to use the road to access the Project worksite. (*Id.*) A tree had also fallen across and blocked the access road. (*Id..*). Plaintiff's employee who inspected the site recommended that FWS retain an engineer to determine locations of unstable soil caused by moisture that would prevent installation of the culverts. (*Id.*). Poor site conditions on the Project persisted and in May of 2023 Plaintiff informed Defendant OTB that the flooding observed earlier continued to impact the Project worksite and a number of trees blocked the access road. (Doc. 69-14, at 26).

On May 17, 2019, Plaintiff submitted a written request to Defendant OTB requesting additional funds to cover the increases in cost of performance. (Doc. 69-14, at 26). First, Plaintiff requested a total of $10,134.80 for additional mobilization costs caused by the deteriorated conditions on the Project worksite. (*See* Doc. 66-3, at 15–19). Second, Plaintiff requested an additional $60,780 to repair the damages to the access road "due to excessive rainfall over the past 5 months." (Doc. 69-14, at 30). On June 6, 2019, Plaintiff reiterated these requests for additional funds in an email to Defendant OTB. (Doc. 66-5, at 1–2).

In response, on June 10, 2019, Defendant OTB issued its first "Notice to Cure" to Plaintiff which instructed Plaintiff to "provide resources, manpower, supervision and equipment" at the Project worksite within 72 hours and complete the work under the Agreement within "2–3 weeks." (Doc. 66-5, at 1). Plaintiff responded to Defendant OTB's first notice to cure on June 13, 2019, and indicated that it was "remobilizing to the site, under protest because of non-payment and with a reservation of rights to payment for additional work." (Doc. 69-14, at 12).

On June 24, 2019, Plaintiff sent Defendant OTB a letter, through counsel, reiterating its demand for additional payment and indicating that Plaintiff could not complete the project by the due date because of weather-related delays. (Doc. 66-6, at 1–2). On June 27, 2019, Defendant OTB issued its second "Notice to Cure" which instructed Plaintiff to respond within 24 hours with a complete recovery schedule to continue work, and notified Plaintiff that failure to continue work would constitute "Anticipatory Repudiation," and would result in Defendant OTB "terminat[ing] [Plaintiff] for default immediately." (Doc. 66-7, at 3). On

4

June 28, 2019, Defendant OTB notified Plaintiff in writing that, because Plaintiff failed to comply with the notices to cure, Defendant OTB was terminating the subcontract for default. (Doc 66-8, at 1).

## III.   STANDARD OF REVIEW

### A.  Motion for Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).[1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact

---

[1] Pursuant to Local Rule 56 the movant for summary judgment shall attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute to be tried. M.D. Ga. L.R. 56. The respondent shall attach to their response a separate statement of material facts to which respondent claims there exists a genuine dispute to be tried. Here, Defendants included a statement of undisputed material facts but did not attach it separately. Plaintiff complied with Local Rule 56 and attached an undisputed statement of material facts separately to their motion for summary judgment. (Doc. 69-1).

is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See id.*, 477 U.S. at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings and by [nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587–88; *Allen v. Tyson Foods, Inc.*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## IV.   LAW AND ANALYSIS

### A.   Choice of Law

As a preliminary matter, the Court will discuss which law governs the claims under the Agreement. In response to an Order from this Court (Doc. 55), the Parties submitted briefing (Docs. 56 & 57) discussing which law applies to this action. On October 7, 2022, the Court issued a preliminary order agreeing with the parties that the Federal Acquisitions Regulations

("FAR") govern claims under the Agreement, but only to the extent that they are expressly incorporated by reference into the Agreement through the flow down provisions, and that the Court should resolve any issues beyond the scope of the flow down provisions under Georgia law. (Doc. 64, at 2–3).

The Agreement has three provisions prescribing which contract law applies to disputes under the Agreement. First, the "General Terms and Conditions" attachment provides that "this Agreement shall be governed in all respects by the laws of the State of Georgia." (Doc. 66-1, at 14 ¶ 39.0). Second, the "Applicable Law for Breach of Contract Claim" flow down provision, incorporating 40 C.F.R. § 52.233-4 by reference, provides that "United States law will apply to resolve any claim of breach of this contract." And third, the Agreement contains an "order of precedence" for interpreting incorporated provisions in the Agreement, which provides, *inter alia*, that the "Prime-Contract Flow-Down Requirements," take precedence over the "General Terms and Conditions." (Doc. 66-1, at 1 ¶ 2.0). Taken together, these provisions indicate that, in general, Georgia law governs the Agreement, except when the flow down provisions expressly supplant Georgia law. Thus, this Court will apply Georgia law, generally, to the Agreement, except when the flow down provisions compel the Court to analyze an issue under FAR.

### B.   Defendants' and Plaintiff's Motions for Summary Judgment on Plaintiff's Breach of Contract Claim

Both Defendants and Plaintiff move for summary judgment on Count I of Plaintiff's Complaint which alleges that Defendant OTB breached the Agreement. (*See* Docs. 66 & 69). Plaintiff alleges that Defendant OTB breached the Agreement in three ways. (Doc. 69). First, Plaintiff argues that, by refusing to pay Invoice 1012, Defendant OTB breached the Agreement. (*Id.* at 13–14). Second, Plaintiff argues that, by refusing to grant Plaintiff's requests for additional compensation and time, Defendant OTB breached the Agreement. (*Id.*, at 14–15). Third, Plaintiff argues that, by terminating Plaintiff's contract in June 2019, Defendant OTB breached the Agreement. (*Id.*, at 15). The Court will address each in turn.

1.      **Breach of Contract under Federal Regulatory Law**

As noted, the Agreement incorporates 40 C.F.R. 52-233-4 by reference, which provides that "United States law will apply to resolve any claim of breach of this contract." (Doc. 66-1, at 19). Because a flow down provision speaks directly to the applicable law for a breach of contract claim, the Court will apply federal regulatory law. Under federal regulatory law, to recover for a breach of contract, a plaintiff bears the burden of establishing (1) a valid contract between the parties, (2) an obligation or duty arising out of this contract, (3) a breach of that duty, and (4) damages caused by the breach. *See San Carlos Irrigation and Drainage Dist v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citing *Pa., Dept. of Transp. v. United States*, 643 F.2d 758, 782 (Ct. Cl. 1989)). As noted, neither party disputes that the Agreement was a properly executed, valid, and enforceable contract. (Doc. 66, at 2 ¶ 1); (Doc. 72-2, at 1, ¶ 1). Accordingly, Plaintiff bears the burden of showing that Defendant OTB had an obligation or duty under the Agreement, Defendant OTB breached that duty, and damages resulted.

i.      **Nonpayment of Invoice 1012**

a.      Plaintiff's Motion

Plaintiff alleges that, by withholding payment for Invoice 1012 without providing a contractual justification, Defendant OTB breached the Agreement. (Doc. 1, at 5 ¶ 49–50); (Doc. 69, at 13–14). Invoice 1012, which was submitted on December 31, 2018, billed Defendant OTB $22,273 for work prior to the Government shutdown. (Doc. 69-14, at 145). Defendant OTB did not dispute Invoice 1012 until June 17, 2019. Plaintiff argues that, by failing to dispute the invoice within 7 days of payment, as Plaintiff contends the Agreement requires, Defendant OTB waived any right to dispute the invoice. (Doc. 69, at 13–14). Defendants counter that it did not pay the invoice because the water damage which appeared after the Government shutdown "nullified the work" billed for in the invoice, and that the paragraph which discussed the seven-day deadline to dispute the invoice merely required that Defendant OTB pay Plaintiff within seven days of receiving funds from FWS. (Doc. 76, at 5–6).

In Georgia, the construction of a contract is a matter of law for the Court. *Est. of Pitts v. City of Atlanta*, 746 S.E.2d 698, 701–02 (Ga. Ct. App. 2013) (citing *City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381 (Ga. 2013)). If a Contract is clear and unambiguous, then a

Court will enforce it according to its clear terms. *Id.* To support its claim that Defendant OTB waived its right to object to Invoice 1012, Plaintiff points to language in the Agreement, which provides that Defendant OTB "shall notify the Subcontractor within 7 days after receipt of invoice" of any "deficiencies identified by Defendant OTB that might prohibit approval" by FWS. (Doc. 69, at 13). In context, however, the paragraph Plaintiff points to reveals that the paragraph obligated Defendant to pay within a certain time period of payment by FWS, rather than describing a dispute resolution process. (*See* Doc. 69-14, at 38, ¶ 3.0).

The paragraph, captioned "PAYMENT," provides that:

> OTB shall pay subcontractor within 7 days of when OTB is paid by [FWS] for work performed by Subcontractor. OTB shall notify Subcontractor within seven (7) days after receipt of invoice from Subcontractor of any deficiencies identified by OTB in the invoice or supporting documentation which may prohibit approval by [FWS].

(*Id.*) The purpose of the "PAYMENT" paragraph, in context, requires Defendant OTB to pay Plaintiff within 7 days of receiving payment from FWS and contains a notification requirement for any potential issues. (*See id.*)

Here, Plaintiff has failed to meet its burden to show that Defendant OTB breached the "PAYMENT" paragraph for two reasons. First, the record is unclear whether Defendant OTB was aware of any deficiencies about which it could have notified Plaintiff within the seven-day period following receipt of the invoice. (*See id.*) Plaintiff submitted the invoice on December 31, 2018, and the "nullification" of the work Defendant OTB alleges was discovered and reported to Defendant OTB on January 16, 2019. (*See id.*) Plaintiff, therefore, invites this Court to find that Defendant OTB breached its obligation to dispute the invoice within seven days, without having knowledge to form the basis for such a dispute. The Court declines to impose such an obligation on the Defendant OTB, unsupported by clear language in the agreement.

Second, even if, for the sake of argument, Plaintiff could show that Defendant OTB failed to meet an obligation to dispute the invoice, it does not follow that Defendant OTB has waived any right to dispute the charges in the invoice. Georgia law does not require "strict and literal performance" of the terms of a contract from a party, instead, it only requires "substantial compliance" with those terms. *Dennard v. Freeport Minerals Co.*, 297 S.E.2d 222, 332–33 (Ga. 1982). The "PAYMENT" paragraph, chiefly, concerns timely payment from

Defendant OTB to Plaintiff after FWS pays Defendant OTB. The paragraph plainly does not, as Plaintiff suggests, explain a dispute resolution process the noncompliance with which would cause Defendant OTB to waive any right to dispute those charges under the Agreement. (*See* Doc. 69-14, at 38 ¶ 3.0). Finally, as Defendants correctly note, Plaintiff has failed to identify, through citations to the record, that FWS paid Defendant OTB for work performed, and, therefore, Plaintiff has failed to meet its burden to show that Defendant OTB failed to substantially comply with the requirements of the "PAYMENT" paragraph. (Doc. 76, at 12); (*See* Doc. 69, at 13–14).

In sum, therefore, Plaintiff has failed to meet its burden to show that Defendant OTB breached its obligations under the "PAYMENT" paragraph as a matter of law. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 69) for Plaintiff's breach of contract claim with respect to Defendant OTB nonpayment of Invoice 1012. Plaintiff asserts payment due for work allegedly performed and Defendants argue that the requirement for said payment was nullified. Therefore, a genuine dispute of material fact remains with respect to that claim.

### b.   Defendants' Motion

Although Defendants move, generally, for summary judgment on Plaintiff's breach of contract claim, Defendants' Motion for summary judgment does not argue for summary judgment specifically with respect to Defendant OTB's nonpayment of Invoice 1012. (*See* Doc. 66, at 14–19). The court declines to make arguments on Defendants' behalf. Accordingly, to the extent, if any, that Defendants assert they are entitled to summary judgment with respect to Defendant OTB's nonpayment of Invoice 1012, the Court **DENIES** Defendants' Motion for Summary Judgment. The Court's conclusion is further supported by its finding, *supra*, that a genuine dispute of material fact remains.

### ii.   Failure to Grant May 2019 Change Orders

Plaintiff next alleges that, by refusing to approve its May 2019 Change Orders requesting additional compensation and time, Defendant OTB breached the Agreement. (Doc. 1, at 5, ¶ 51–52). Defendants counter that the Agreement did not require it to grant those requests. (Doc. 76, at 13).

The "Changes and Changed Conditions" clause ("Changes Clause") a flow down provision, which incorporates 48 C.F.R. § 52.243-5, describes the procedures for submitting change orders for differing worksite conditions. (Doc. 69-2, at 18–19). FAR clauses incorporated into Government subcontracts implement federal regulations and are therefore interpreted pursuant to federal procurement regulatory law. *See, e.g., Shaw Env't, Inc. v. Teledyne Brown Eng'g Inc.*, (No. CV-09-S-01100-NE) 2010 WL 5924321, at *6 (N.D. Ala. 2010); *DynCorp Info. Sys., LLC v. United States*, 58 Fed. Cl. 446, 451–52 (Fed. Cl. 2003) (citing *Newport News Shipbuilding & Dry Dock Co. v. Garett*, 6 F.3d 1547, 1552 (Fed. Cir. 1993)).

The Changes Clause provides that a Subcontractor shall notify the Contractor of "subsurface or latent physical conditions differing materially from those indicated in this contract," if those changes "increase the cost of, or time required for performing the work, the [Contractor] shall make an equitable adjustment." Under FAR, equitable adjustments are changes to the contract price used to keep a contractor whole to account for changed circumstances during performance. *See U.S. ex rel. Bettis v. Odebrecht Contractors of Cal.*, 393, F.3d 1321, 1324 (D.C. Cir. 2005).

To receive an equitable adjustment for differing site conditions under the Changes Clause a Plaintiff must prove that:

(1) a reasonable contractor reviewing the contract documents as a whole would interpret them as making a representation about the site conditions;

(2) the actual site conditions were not reasonably foreseeable to the contractor [],

(3) the particular contractor in fact relied on the contract representation; and

(4) the conditions differed materially from those represented and . . . the contractor suffered damages as a result.

*Walsh Const.. Co. v. United States*, 140 Fed. Cl. 385, 411 (Fed. Cl. 2018) (citing *Meridian Eng'g Co. v. United States*, 885 F.3d, 1351, 1356 (Fed. Cir. 2018)).

First, the Plaintiff must show that "a reasonable contractor reviewing the contract documents as a whole would interpret them as making a representation about the site conditions. *Walsh Constr.*, 140 Fed. Cl. 385, 411 (Fed. Cl. 2018) (citing *Meridian*, 855 F.3d at 1356). If a contract does not provide an affirmative indication of the alleged differing site condition, a reasonable contractor could not interpret that contract as making a representation

about those conditions. *See H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1347 (Fed. Cir. 1998). Determining whether a contract contained indications of a particular site condition is a matter of contract interpretation and thus presents a question of law. *See id.* Plaintiff contends that excessive rainfall causing excess water onsite and erosion was a differing site condition which entitled them to an equitable adjustment. (Doc. 69, at 2–15). Accordingly, Plaintiff bears the burden of proving that the contract makes an affirmative representation that the worksite would be free of excess water which might damage the worksite.

Here, the Agreement plainly warned of the uncertainty of weather conditions and the risk of excess water damage and erosion posed to the worksite. Defendants point to at least eight contract provisions which warn of the risk of water and/or erosion might pose to the worksite. (Doc 66-1, at 49 ¶ 1.3 ("[sub]contractor is responsible for erosion control [and] spill prevention")); (Doc. 66-1, at 49, ¶ 1.3 ("trees regularly fall across roads, preventing access. [Sub] Contractor shall be responsible for tree removal for the duration of the contract to allow unimpeded access to complete the project")); (Doc 66-1, at 51–52, ¶ 6.0 ("water remains in the refuge ditches year-round. Water levels are highest in the late winter, early spring . . . the [sub]contractor will be responsible for the control of the surface water and groundwater as necessary")); (Doc 66-1, at 54 ¶ 16.0 ("work delays due to weather should be expected to occur. The majority of the project involves work inside a large wetland complex during times when floods, rainfall, and freezing temperatures may be expected to occur")); (Doc 66-1, at 69–70 ("the [sub]contractor is responsible for control of surface/sub-surface water and drainage during the construction period")); (Doc 66-1, at 71 ("backfilling must be as continuous as possible and the fill maintained such that drainage is assured at all times")); (Doc 66-1, at 71 ("[sub]contractor is responsible for control of surface/sub-surface water and drainage during the construction period. All temporary fills and/or crossings necessary to promote construction will be installed and removed at the Contractor's expense prior to acceptance of the work. . . Control of surface and subsurface shall be maintained in accordance with construction specification 205 — Water Control")); (Doc 66-1, at 72 ("[sub]contractor is responsible for control of surface/sub-surface water and drainage during the construction period . . .any claims arising from failure of these temporary works will be the [sub]contractor's responsibility")).Yet Plaintiff has failed to direct this Court to a single provision in the Agreement that indicates that

12

the contract affirmatively represented that the site would be free of damaging excess water. (*See* Doc. 69, at 2–15). This Court finds, therefore, that Plaintiff has failed to meet its burden to show that a reasonable contractor would interpret the Agreement as making an affirmative representation regarding its alleged differing condition.

Second, Plaintiff must produce evidence that the actual site conditions were not reasonably foreseeable to it, based on the contract documents and other information available when the contract was signed. *Walsh Constr.*, 140 Fed. Cl. at 411 (Fed. Cl. 2018) (citing *Meridian*, 855 F.3d at 1356–1357). As noted, Defendants have identified ample contractual language warning of the danger of damaging excess water and allocating to Plaintiff the responsibility to protect against such a condition. (Doc 66-1, at 49 ¶ 1.3); (Doc. 66-1, at 49, ¶ 1.); (Doc. 66-1, at 51–52, ¶ 6.0); (Doc. 66-1, at 54 ¶) 16.0; (Doc. 66-1, at 69); (Doc. 66-1, at 71); (Doc. 66-1, at 71); (Doc. 66-1, at 72).

Plaintiff directs this Court to the reports of its employees about the extent of the damages from various employees of Defendant OTB and Plaintiff. *See e.g.,* (Doc 69-8, at 2–3; Doc. 69-13, at 1–3). The Court agrees with Plaintiff to the extent that the record demonstrates that the site was significantly damaged by excess water which may have had a significant impact on its ability to complete its work under the Agreement. Plaintiff, however, has failed to show, as a matter of law, that such damage was unforeseeable.

All of the damage Plaintiff identifies was caused by excess water, and as Defendants have shown, the Agreement consistently warned Plaintiff that Plaintiff was responsible for protecting against excess water damage, and that Plaintiff bore the risk of the increases in cost such damage might cause. (*See, e.g.,* Doc 66-1, at 49 ¶ 1.3). The Court finds, therefore, that Plaintiff has failed to meet its burden to show that the site conditions which occurred were not reasonably foreseeable as a matter of law.

Third, Plaintiff must show it actually relied on the contract representation. Here, as noted, Plaintiff has failed to show any affirmative representation about the alleged differing site conditions. (*See* Doc. 69, at 2–15). Plaintiff, accordingly, cannot show reliance on such a representation. The Court finds, therefore, that Plaintiff has failed to meet its burden to show that it actually relied on the contract representation.

Fourth, Plaintiff must show that the conditions "differed materially from those represented and . . . the [sub-]contractor suffered damages as a result. *Walsh Constr.*, 140 Fed. Cl. at 413–14 (citing *Meridian*, 855 F.3d at 1356). Here, as noted, Plaintiff has failed to show any affirmative representations in the Agreement about the alleged differing site condition. (*See* Doc. 69, at 2–15). Plaintiff, consequently, cannot show that the actual site conditions materially differed from such a representation. By contrast, Defendants have shown that the Agreement was suffused with language which put Plaintiff on notice about the risk of damaging excess surface water. The Court finds, therefore, that Plaintiff has failed to meet its burden to show that the site conditions differed materially from those represented and that it suffered damages as a result.

In sum, therefore, the Court finds, as a matter of law, that Plaintiff has failed to meet its burden to show that Defendant OTB breached the Agreement by failing to grant its May 2019 Change Orders. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 66) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 69) for Plaintiff's breach of contract claim with respect to Defendant OTB's failure to approve its May 2019 Change Orders. The Court's conclusions here are limited to this claim. Accordingly, the Court makes no finding or reaches any conclusions as to whether the conditions alleged affect any other claim.

### iii.   Termination on June 27

Plaintiff next alleges that, by terminating Plaintiff from the Agreement on June 27, 2019, Defendant OTB breached the Agreement.  (Doc. 1, at 6, ¶ 53–54).

### a.   Plaintiff's Motion

Plaintiff, in its motion, included a sub-heading entitled "OTB Wrongfully Terminated AGS on the Basis of Anticipatory Repudiation," under its heading arguing that it is entitled to summary judgment for its breach of contract claims yet appears to have overlooked including text below explaining why, exactly, it is entitled to summary judgment on that issue, and which facts it believes support such a finding by this Court. (*See* Doc. 69, at 15). "At the summary judgment stage, it is not the Court's duty to locate the legal arguments or evidence which might show that summary judgment is or is not warranted." *Wright v. Old Gringo Inc.*, No. 17-CV-1996-BAS-MSB, 2018 WL 6568199, at *4 (S.D. Cal. Dec. 13, 2018). Judges are "not like pigs, hunting

14

for [buried] truffles." *Chavez v. Sec'y Fla Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011); *see also Marketquest Grp., Inc. v. BIC Corp.,* 316 F. Supp. 3d 1234, 1249 n.4 (S.D. Cal. 2018) ("The Court should not have to 'search for truffles' in the evidentiary record submitted with the parties' motions to discover the facts supporting Plaintiff's claims.")

The Court declines to make arguments on Plaintiff's behalf and therefore finds that Plaintiff has failed to show that it is entitled to summary judgment on its breach of contract claim. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 69) on Plaintiff's breach of contract claim with respect to Defendant OTBs termination of the Agreement on June 28, 2019.

    **b.    Defendants' Motion**

The Court next turns to Defendants' argument that it was entitled to terminate the Agreement on grounds of anticipatory repudiation. Defendants argue that, by removing its personnel and equipment from the worksite on June 28, 2019, Plaintiff anticipatorily repudiated the Agreement, thereby entitling Defendant OTB to terminate the Agreement. (Doc. 66, at 17).[2]

Plaintiff argues that pursuant to this Court's October 7, 2023, Order (Doc. 64) (discussed *supra*, at pp. 8–9), Georgia law controls Defendants' assertion of anticipatory repudiation as a defense. Plaintiff is, indeed, correct that Georgia law would control if the flow down provisions were silent on a particular issue. Here, however, as noted, the flow down provisions are not silent on this issue. The Agreement incorporates 40 C.F.R. 52-233-4 by reference, which provides that "United States law will apply to resolve any claim of breach of this contract." (Doc. 66-1, at 19). Anticipatory repudiation is a defense to breach of contract, the Court will accordingly analyze its applicability here under federal regulatory law.

Federal regulatory law adopts a view of anticipatory repudiation in line with the Second Restatement of Contracts. *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1337–38 (Fed. Cir. 2000). Under this view, an obligee may demand an adequate assurance of performance under a

---

[2] The Court notes that Defendants failed to articulate anticipatory repudiation as an affirmative defense in its Answer. (*See* Doc. 23, at 2). The Court finds, however, that because Defendants pleaded anticipatory repudiation as a counterclaim in its Answer, Plaintiff and this Court are on sufficient notice of that defense. The Court, accordingly, will allow Defendants to assert anticipatory repudiation as an affirmative defense to Plaintiff's breach of contract claim.

contract, and if the obligor does not provide such an assurance the obligee may treat this as a repudiation of the contract thereby excusing the obligee's performance. *See id.* (citing *Restatement (Second) of Contracts* § 251 (1981)). Critically, however, the Second Restatement does not limit the defense of anticipatory repudiation to "express and unequivocal repudiation[s] of the contract." Instead, anticipatory repudiation includes cases in which "reasonable grounds support the obligee's belief that the obligor will breach the contract." *Id.* (citing *Restatement (Second) of Contracts* § 251 (1981)). In the context of government contracts, this means, in practice, a contractor must give reasonable assurances of performance in response to a validly issued cure notice. *Danzig*, 224 F.3d at 1338. A cure notice is validly issued if a party had a "reasonable basis to conclude that the contract would not be completed." *See Danzig*, 224 F.3d 1333 at 1338; *see also* Restatement (Second) of Contracts § 251 cmt. a).

Here, Defendants and Plaintiff genuinely disagree about at least three material facts. First, Defendants and Plaintiff dispute when Plaintiff was ordered to return to work. *Compare* (Doc. 66, at 3, ¶ 15) *to* (Doc. 72-1, at 3, ¶ 15). Defendants assert that Plaintiff was ordered to recommence work on June 5, 2019. (Doc. 66, at 3, ¶ 15). Defendants include correspondence between Defendant OTB and Plaintiff that supports this position. (Doc. 66-3, at 6). Plaintiff, however, asserts that it was directed to return to work on June 13, 2019. (Doc. 72-1, at 3, ¶ 15). In support of this position, Plaintiff cites the Declaration of Steve Kepley, Plaintiff's project manager, who attested that "On June 14, 2019, [Plaintiff] mobilized to the Site following receipt of [Defendant OTB's] written direction to return to the site, which was provided on June 13, 2019". (Doc. 72-4, at 6, ¶ 52).

On June 10, 2019, Defendant OTB issued its first cure notice which alleged that Plaintiff had refused to return to the worksite and demanded it return to work by. June 14, 2019. (*See* Doc. 66-5, at 1–8). Because the date on which Plaintiff was ordered to return to the worksite speaks directly to whether Defendant OTB had a reasonable basis to conclude that the contract would not be completed, that date is material. Defendant OTB had a reasonable basis to conclude that the contract would not be completed. The Court must view all evidence and factual inferences in the light most favorable to the nonmoving party, in this case, Plaintiff. *See Matsushita*, 475 U.S. at 587–88; *Allen*, 121 F.3d at 646. Taking this view, the Court must credit as true Mr. Kepley's Declaration, and infer that Plaintiff was not required to return to

work until June 14, 2019, which might cast serious doubt on whether Defendant OTB could reasonably conclude that Plaintiff would not complete the contract. Accordingly, the Court finds there to be a genuine dispute of material fact about whether the first cure notice was validly issued.

Second, Defendants and Plaintiff dispute whether Plaintiff complied with the first cure notice. *Compare* (Doc. 66, at 17) *to* (Doc. 69, at 10). Defendants assert that when Plaintiff returned to the worksite on June 14, 2019, Plaintiff mobilized only a small crew to the worksite the members of which did not perform work under the Agreement. (Doc. 66, at 17). In support of this, Defendants cite the Declaration of Christopher Hayward, Defendant OTB's manager on the Project, and its second cure notice. (Doc. 76-6, at 1–3); (Doc. 75-10, at 1). Plaintiff, however, asserts that it mobilized to the site as required by the first cure notice, "to continue its work and complete the Project." (Doc. 69, at 10).  In support of this, Plaintiff cites Mr. Kepley's Declaration. (Doc. 72-4, at 6, ¶ 58).

On June 27, 2019, Defendant OTB issued its second cure notice alleging that Plaintiff had failed to continue work under the Agreement as required by the first cure notice. (Doc. 69-17, at 1–8). Because whether Plaintiff, in fact, complied with the first cure notice speaks directly to whether Defendant OTB had a reasonable basis to conclude that the contract would not be completed, whether Plaintiff complied is material. Viewing the evidence in the light most favorable to Plaintiff, the Court must credit as true Mr. Kepley's Declaration which might cast serious doubt on whether the second cure notice was validly issued. Accordingly, the Court finds there to be a genuine dispute of material fact about whether the first cure notice was validly issued.

Third, Defendants and Plaintiff disagree about whether Plaintiff abandoned the worksite on June 28, 2019. *Compare* (Doc. 28, at 10) *to* (Doc. 69, at 11). Defendants assert that by June 28, 2019, at 1:30 P.M., Plaintiff had abandoned the worksite and removed all of its equipment, and, after confirming that Plaintiff had abandoned the worksite, Defendant OTB issued its termination notice. (Doc. 28, at 10). In support of this position, Defendants cite Mr. Hayward's Declaration and its termination notice. (Doc. 76-6, at 2, ¶ 29); (Doc. 76-11). Plaintiff, however, asserts that it did not abandon the worksite and was on the worksite when it received

Defendant OTB's termination notice. (Doc. 69, at 11). In support of this position, Plaintiff cites its communications with Defendant OTB on June 28, 2019. (*See* Docs. 69-18 & 69-19).

Whether Defendant OTB, in fact, reasonably believed that Plaintiff would breach the Agreement, thereby excusing Defendant OTB's performance, depends on a number of factors. For example, Plaintiff points to an email to Defendant OTB on, on June 28, 2019, at 10:28 A.M in which Plaintiff informed Defendant OTB that "AGS does <u>not</u> repudiate (and has never repudiated) its obligations under [the Agreement]." (Doc. 69-18, at 1). Although this email is uncontroverted, the factual context surrounding this email is critical to any determination of Defendant OTB's reasonable beliefs about Plaintiff's performance. Defendants and Plaintiff, as noted, genuinely disagree on at least three key factual issues: (1) when Plaintiff was ordered to return to the worksite, (2) whether Plaintiff complied with the first cure notice, and (3) whether Plaintiff abandoned the worksite before Defendant OTB terminated the Agreement. Accordingly, the Court finds there to be a genuine dispute of material fact about whether Defendant OTB reasonably believed Plaintiff would breach the Agreement, thereby excusing Defendant OTB's performance on the basis of anticipatory repudiation.

In sum, therefore, Defendant has failed to meet its burden to show that there is no genuine dispute of material fact about whether it was entitled to terminate Plaintiff from the Agreement on June 28, 2019, on the basis of anticipatory repudiation. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 66) for Plaintiff's breach of contract claim with respect to Defendant OTB's termination of Plaintiff from the Agreement on June 28, 2019.

### C.    Defendants' Motion for Summary Judgment on Plaintiff's Quantum Meruit Claim

Defendants move for summary judgment on Count II of Plaintiff's Complaint (Doc. 1) which alleges that Plaintiff is entitled to recover in quantum meruit from Defendants the "reasonable value of the labor, equipment, materials, services, and supplies furnished by AGS that were used to improve the Property." (Doc. 66, at 19). Defendants argue that because "the contract is very clear with regard to the maintenance of the rods[sic], control of water and removal of trees. Plaintiff is due no compensation for performing tasks which are clearly part of its contract." (Doc. 66, at 22).

Plaintiff has failed to make arguments in opposition to Defendants' motion either in its Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 72), or its Motion for Summary Judgment (Doc. 69). The Court, however, may not grant summary judgment solely by virtue of a party's default. *Jones v. Pandey*, 390 F. Supp. 3d 1371, 1375 (M.D. Ga. 2005) (citing *Trustees of Cent. Pension Fund of Int'l Union of Operating Eng'g and Participating Emps. v. Wolfe Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004). Instead, the Court must conduct an independent review of the record to determine whether summary judgment is appropriate. *Id.*

To recover on quantum meruit, a plaintiff must show (1) it performed services valuable to defendant, (2) either at the request of the defendant or knowingly accepted by the defendant, (3) defendant's receipt of which without compensating plaintiff would be unjust, and (4) plaintiff expected compensation at the time it rendered the services. *Synergy Worldwide Inc. v. Long, Haymes, Carr, Inc.*, 44 F. Supp. 2d 1348, 1358 (N.D. Ga. 1998) (citing *Artrac Corp. v. Austin Kelley Advert., Inc.*, 399 S.E.2d 529 (1990)). It is well established under Georgia law, however, when a plaintiff's claim is based on an express contract that plaintiff may not recover in quantum meruit. *See HessMorganHouse, LLC v. Kingdom Grp. of Companies, LLC*, 415 F. Supp 3d 1176, 1185 (M.D. Ga. 2019) (citing *Blueshift, Inc., v. Advanced Computing Tech., Inc.*, 616 S.E.2d 816 (Ga. Ct. App. 2005)); *see also Lord Jeff Knitting Co. v. Lacy*, 393 S.E.2d 55, 56 (Ga Ct. App. 1990) ("while the parties may plead in alternative counts, there can be no recovery in quantum meruit where an express contract governs all the claimed rights and responsibilities of the parties.")

Here, as noted, neither party disputes that the Agreement was a properly executed, valid, and enforceable contract. (Doc. 66, at 2, ¶ 1); (Doc. 72-2, at 1, ¶ 1). Plaintiff, therefore, may not recover in quantum meruit. Accordingly, the Court, **GRANTS** Defendants' Motion for Summary Judgment with respect to Plaintiff's quantum meruit claim.

**D.      Plaintiffs and Defendants' Motions for Summary Judgment on Plaintiff's Miller Act Claim**

Both Defendants and Plaintiff move for summary judgment on Count III of Plaintiff's Complaint (Doc. 1) which alleges that Plaintiff is entitled to relief under 40 U.S.C. § 3133. *See* (Docs. 66 & 69).

**i.      Defendants' Motion**

Defendant argues that any claim Plaintiff makes to recover under Section 3133 depends on a "substantiated claim for breach of contract or quantum meruit," and, as result, because Defendants are entitled to summary judgment on Plaintiff's breach of contract and quantum meruit claims, Defendants are also entitled to summary judgment on Plaintiff's claim under Section 3133.

This Court has determined, *supra*, that Defendants are not entitled to summary judgment on Plaintiff's claim for breach of contract. Defendants' argument, therefore, fails. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment with respect to Plaintiff's Miller Act Claim.

**ii.      Plaintiff's Motion**

Plaintiff argues that it is entitled to summary judgment on its claim under Section 3133 because there is no dispute as to any of the elements of a claim under Section 3133. (Docs. 69 & 20). Defendants counter that Plaintiff is not entitled to summary judgment because there are a number of these facts in dispute. (Doc. 76, at 17).

The Miller Act, at 40 U.S.C. § 3133 requires a government contractor to post a surety bond to protect parties who supply labor or materials on a federal project. *U.S. for Use and Benefit of Krupp Steel Prod., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir. 1987) (citing *F.D. Rich Co. v. Indus. Lumber Co.*, 417 U.S. 116, 118 (1974). The Miller Act was designed to provide an alternative remedy for subcontractors on government contracts, and courts must construe its terms liberally in accordance with Congressional intent that the act be "highly remedial," in nature. *U.S. for Use and Benefit of Krupp Steel Prod., Inc,* 831 F.2d at 980 (citing *J.W. Bateson Co. Inc., v. U.S. ex rel. Bd. of Tr. of Nat. Automatic Sprinkler Indus. Pension Fund et al.*, 434 U.S. 586, 594 (1978)).

A Plaintiff, in general, must prove four elements to collect under Section 3133: (1) that materials were supplied for work in the particular contract at issue, (2) that the supplier was not paid, (3) the supplier believed, in good faith, that the materials were for the specified work; and (4) the jurisdictional requirements were met. *U.S. for Use and Benefit of Krupp Steel Prod.., Inc.*, 831 F.2d at 980 (citing *United States v. Avanti Const., Inc.*, 750 F.2d 759 (9th Cir. 1984), *cert. denied*. However, as Defendants correctly observe in their original Motion (Doc. 66, at 22) Plaintiff cannot prevail on a claim under Section 3133 without proving either a breach of the contract at issue, or a quantum meruit claim. *Jefferson Const. Co. U.S. for Use and Benefit of Bacon*, 283 F.2d 265, 276–278 (1st Cir. 1960), *cert. denied* (holding that failure to plead or prove compliance with underlying contract precluded summary judgment).[3]

Here, as noted, several genuine disputes of material fact remain with respect to Plaintiff's breach of contract claim, and Defendants are entitled to summary judgment on Plaintiff's quantum meruit claim. Consequently, because a genuine dispute of material fact remains as to Plaintiff's breach of contract claim, and Plaintiff must establish a breach of contract claim to prove its Miller Act Claim, a genuine dispute of material fact exists as to Plaintiff's Miller Act claim. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Plaintiff's Miller Act Claim.

### E.    Plaintiff's and Defendants' Motions for Summary Judgment on Plaintiff's Prompt Payment Act Claim

Defendants move for summary judgment on Count IV of Plaintiff's Complaint (Doc. 1) which alleges that Plaintiff is entitled to recover under the North Carolina Prompt Payment Act codified at N.C.G.S. § 22C-2. Plaintiff has failed to make arguments in opposition to

---

[3] This Court's review of Eleventh Circuit authority has not revealed a case which directly supports the proposition that a Plaintiff must prove a breach of contract or quantum meruit claim to recover under Section 3133. A review of the authority in other Circuits, however, demonstrates that an underlying claim for breach of contract or quantum meruit is necessary for a plaintiff to recover under Section 3133. *Jefferson Const. Co. U.S. for Use and Benefit of Bacon*, 283 F.2d 265, 276–278 (1st Cir. 1960), *cert. denied*; *United States ex rel. Foster Wheeler Corp. v. American Surety of N.Y.*, 142 F.2d 726, 728 (2d Cir. 1944) (holding that a subcontractor must show that it performed its obligations under the contract to recover); *U.S. ex rel. Tennessee Valley Marble Holding Co. v. Grunely Const.*, 433 F.Supp 2d 104, 116 (D.C. Circuit) (holding that "a supplier is not entitled to more payment that to which it is entitled in contract"); *U.S. for Use and Benefit of Martin Steel Const., Inc.*, 750 F.2d 759, 761 (9th Cir. 1984), *cert. denied*.

Defendants' motion either in its Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 72), or its Motion for Summary Judgment (Doc. 69).

As noted, this Court may not grant summary judgment solely by virtue of a party's default. *See e.g., Pandey*, 390 F. Supp. 3d at 1375 (citing *Trustees of Central Pension Fund of Int'l Union of Operating Eng'g and Participating Emp. v. Wolfe Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004). Instead, the Court will conduct an independent review of the record to determine whether summary judgment is appropriate. *Id.*

Here, as noted, this Court will apply Georgia law, generally, to the Agreement, except when the flow down provisions compel the Court to analyze an issue under FAR.[4] Because Plaintiff pleaded a violation of the North Carolina Prompt Payment, which is a North Carolina Statute, and therefore provides a cause of action only under North Carolina Law, it is inapplicable to the instant case.

Accordingly, the Court, **GRANTS** Defendants' Motion for Summary Judgment with respect to Plaintiff's Prompt Payment Act Claim.

## F.     Plaintiff's Motion for Summary Judgment on Defendants' Anticipatory Repudiation Claim

Plaintiff moves for summary judgment on Defendants' first counterclaim for "Anticipatory Repudiation" which alleges that Plaintiff "abandoned" the job which caused Defendant OTB to find another subcontractor "at great expense." (Doc. 69, at 15–20); (Doc. 76, at 13–18).

Plaintiff argues that Anticipatory Repudiation is not a valid standalone cause of action under federal regulatory law or Georgia law. (Doc. 69, at 15). Defendants appear to argue that Defendants' Anticipatory Repudiation entitled it to terminate the contract and recover damages for breach of contract and under the "Default" provision under 40 C.F.R. § 52.249-10, incorporated by reference into the Agreement as a flow down provision. (*See* Doc. 66, at 23–27).

---

[4] Defendants' brief appears to argue that the FAR "Prompt Payment for Construction Contracts Clause" flow down provision governs Plaintiff's Prompt Payment Act Claim. (Doc. 66, at 29). Because Plaintiff's complaint does not allege a violation of the flow down provision Defendants reference, the Court has no need to reach whether Defendant OTB breached that flow down provision because Plaintiff makes a claim under North Carolina law, which as discussed, is inapplicable here.

The Court finds Defendants' argument, at best, puzzling. In this Court's October 7th, 2022, Order, the Court ruled that, "even if the Defendant[s] now articulate[] claims for default termination and breach of contract, Defendant[s] ha[ve] waived those counterclaims. Accordingly, Defendants' counterclaim shall be limited to a claim of anticipatory repudiation." Despite the Court's clear guidance, Defendants have nonetheless argued that it is entitled to recover for breach of contract and under the "Default" flow down provision. Accordingly, the Court feels it must reiterate why Defendants have waived its claim to recover under the "Default" flow down provision.

While Defense Counsel may have attempted to articulate counterclaims for default termination (Doc. 23), that claim was not sufficiently articulated to put Plaintiff, or this Court, on notice that Defendants were bringing a claim for default termination. (Doc. 23, at 15 ¶¶ 110, 113, 115 & 117). Moreover, the Court's review of the record demonstrates that Plaintiff and this Court were both under the impression that Defendants' "counterclaim was limited to a single claim against Plaintiff for anticipatory repudiation." (Docs. 26, 33, 42, 52, & 57). Defendants, alone, bore the responsibility to bring this oversight, if any, to the Court's and opposing counsel's attention during any of the extensions of discovery this Court granted to the Parties to engage in settlement negotiations. And critically, Defendant never formally amended or moved to amend its counterclaim.

As noted, Defendants argue in their motion for summary judgment, and its response to Plaintiff's motion for summary judgment, essentially, that Plaintiff's anticipatory repudiation entitles it to collect damages under a breach of contract theory and the Default provision of the Contract. (*See* Docs. 66 & 76). The Court will not permit Defendants to circumvent a previous Order so easily. Accordingly, the Court, for the purposes of this motion, will not consider any other counterclaim but an independent anticipatory repudiation claim which "stands on its own two feet" without reference to counterclaims that this Court has already determined that Defendants have waived.

The Court, now, turns to Plaintiff's argument in favor of summary judgment. Plaintiff argues that neither federal regulatory law, nor Georgia law recognize anticipatory repudiation as an independent cause of action. (*See* Doc. 69, 15–20).  As noted, the Court will apply Georgia law, generally, to the Agreement, except when the flow down provisions compel the

Court to analyze an issue under federal regulatory law. Accordingly, the Court will determine, first, if federal regulatory law, as incorporated into the Agreement, recognizes Anticipatory Repudiation as an independent claim, and if not, the Court will determine if such an independent cause of action exists under Georgia Law. Defendants make arguments under both legal frameworks. (*See* Doc. 23, at 23–28); (*see also*, Doc. 76, at 13–19).

Defendants rely on *Danzig v. AEC Corp.*, for its standard for an anticipatory repudiation cause of action. (Doc. 66, at 25) (citing *Danzig*, 224 F.3d at 1337). *Danzig* does, indeed, provide the standard for anticipatory repudiation under federal regulatory law. *See Danzig*, 224 F.3d at 1337. A closer reading of *Danzig*, however, reveals that the case does not separate anticipatory repudiation as an independent cause of action. *Id.* Instead, *Danzig* announced the standard for determining whether a contractor's anticipatory repudiation qualified as a breach of contract, thereby entitling the Government to terminate the contract for default. *Id.* In other words, *Danzig* does not authorize anticipatory repudiation as an independent cause of action, rather, it is a justification for termination of the contract, which could give rise to liability for default. *Id.* Accordingly, the Court finds that anticipatory repudiation is not an independent cause of action under federal regulatory law.

The Court, next, turns to whether anticipatory repudiation is an independent cause of action under Georgia law. Defendants cite three Georgia cases which it argues supports its claim that anticipatory repudiation is an independent cause of action. (Doc. 76, at 14) (citing *Coffee Butler Svc. v. Sascha*, 366 S.E.2d 672 (Ga. 1988); *Clark v. Cox*, 347 S.E.2d 4 (Ga. 1986); *J. M. Clayton Co. v. Martin*, 339 S.E.2d 280 (1985). Each case, however, makes clear that anticipatory repudiation may form the *basis* of a breach of contract action, but do not go as far as to say that anticipatory repudiation, by itself, is a cause of action.[5] *See Coffee Butler Svc. v. Sascha*, 366 S.E.2d 672 (Ga. 1988); *Clark v. Cox*, 347 S.E.2d 4 (Ga. 1986); *J. M. Clayton Co. v. Martin*, 339 S.E.2d 280 (1985). Accordingly, the Court finds that anticipatory repudiation is not an independent cause of action under Georgia law.

---

[5] For example, in *Coffee Butler Serv. Inc. v. Sacha*, the Court found that "the breach will form the basis for an anticipatory breach of contract action is an unqualified repudiation of the entire contract prior to the time for performance. 366 S.E. 2d at 673.

In sum, because anticipatory repudiation is neither an independent cause of action under federal regulatory law as incorporated through the flow down provisions, nor an independent cause of action under Georgia law, the Court finds that Defendants cannot maintain a claim for anticipatory repudiation. Accordingly, the Court, **GRANTS** Plaintiff's Motion for Summary Judgment with respect to Defendants' anticipatory repudiation counterclaim.[6]

## CONCLUSION

In sum, Defendants' Motion for Summary Judgment (Doc. 66) is **GRANTED-IN-PART** and **DENIED-IN-PART.**, and Plaintiff's Motion for Summary Judgment (Doc. 69) is **GRANTED-IN-PART** and **DENIED-IN-PART.**

In more detail, the Court **DENIES** Plaintiff's Motion for summary judgment with respect to Plaintiff's claim that Defendant OTB breached its obligations by failing to pay Invoice 1012. And to the extent, if any, that Defendants assert they are entitled to summary judgment with respect to Defendant OTB's nonpayment of Invoice 1012, the Court **DENIES** Defendants' Motion for Summary Judgment.

The Court **GRANTS** Defendants' Motion for summary judgment with respect to Defendant OTB's failure to approve Plaintiff's May 2019 Change Orders. And the Court **DENIES** Plaintiff's Motion for summary judgment with respect to Defendant OTB's failure to approve its May 2019 Change Orders.

The Court **DENIES** Plaintiff's Motion for summary judgment with respect to Defendant OTB's termination of the Agreement on June 28, 2019. And the Court **DENIES** Defendants' Motion for summary judgment with respect to Defendant OTB's termination of the Agreement on June 28, 2019.

The Court **GRANTS** Defendants' Motion for summary judgment with respect to Plaintiff's quantum meruit claim.

---

[6] Plaintiff, in its Opposition to Defendants' Motion for Summary Judgment argues that "Judgment for Defendant is Precluded by way of its Unclean Hands." (Doc. 72, at 9). Because the Court has granted Plaintiff's Motion for Summary Judgment with respect to Defendants' counterclaim, the Court finds it unnecessary to analyze Plaintiff's Unclean Hands defense.

The Court **DENIES** Defendants' Motion for summary judgment on Plaintiff's Miller Act Claim. And the Court **DENIES** Plaintiff's Motion for summary judgment with respect to Plaintiff's Miller Act Claim.

The Court **GRANTS** Defendants' Motion for summary judgment with respect to Plaintiff's Prompt Payment Act Claim.

The Court, **GRANTS** Plaintiff's Motion for Summary Judgment with respect to Defendants' anticipatory repudiation counterclaim.[7]

Accordingly, the only claims that remain in the above-styled action is Plaintiff's breach of contract claim with respect to Defendant OTB's nonpayment of Invoice 1012, Defendant OTB's termination of Plaintiff from the Agreement on June 28, 2019, and Plaintiff's Miller Act Claim.

**SO ORDERED**, this 18th day of September 2023.

/s/W. Louis Sands_____
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[7] Plaintiff, in its Opposition to Defendants' Motion for Summary Judgment argues that "Judgment for Defendant is Precluded by way of its Unclean Hands." (Doc. 72, at 9). Because the Court has granted Plaintiff's Motion for Summary Judgment with respect to Defendants' counterclaim, the Court finds it unnecessary to analyze Plaintiff's Unclean Hands defense.